IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FREDDIE BLEIWEISS,                 §
                                   §
            Plaintiff,             §
                                   §
VS.                                §   CIV. ACTION NO. H-13-0080
                                   §
PANDUIT SALES CORP.,               §
                                   §
            Defendant.             §

<u>**OPINION AND ORDER OF SUMMARY JUDGMENT**</u>

Pending before the Court in the above referenced cause, removed from state court on diversity jurisdiction and alleging discriminatory termination of employment based on age and disability, in violation of § 21.051 of the Texas Labor Code, [1] during a business reorganization is Defendant Panduit Sales Corp.'s ("Panduit's") motion for summary judgment (instrument #15).

After a careful review of the record and the applicable law, for the reasons stated below the Court concludes that Plaintiff Freddie Bleiweiss has failed to meet his burden of proof and that Panduit's motion should be granted.

**Standard of Review**

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most

---

[1] The popular name for Chapter 21 of the Texas Labor Code is the Texas Commission on Human Rights Act or TCHRA. Texas abolished the Texas Commission on Human Rights in March 2004 and transferred its duties to the Texas Work Commission. Although the Texas Supreme Court stated it would not use the earlier name, the popular name is still used by many courts. *Little v. Texas Dept. of Criminal Justice*, 148 S.W. 3d 374, 377-78 (Tex. 2004); *ATI Enterprises, Inc. v. Din*, 413 S.W. 3d 247, 249 n.3 (Tex. App.-- Dallas Oct. 23, 2013).

favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact on which the nonmovant bears the burden of proof at trial; a "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir. 1998).

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing*

*Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S.  at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

Allegations in a plaintiff's complaint are not evidence. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996)("[P]leadings are not summary judgment evidence."); *Johnston v. City of Houston, Tex.,* 14 F.3d 1056, 1060 (5th Cir. 1995)(for the party opposing the motion for summary judgment, "only evidence--not argument, not facts in the complaint--will satisfy' the burden."), *citing Solo Serve Corp. v. Westown Assoc.,* 929 F.2d 160, 164 (5th Cir. 1991).

**Factual Allegations of Plaintiff's Original Petition (#1-3)**

Panduit employed Plaintiff for five years and nine months as a System Sales Engineer until he was terminated on September 30, 2011 while Panduit was undergoing a reorganization or reduction in force ("RIF").  In April 2011, Thomas Kean ("Kean"), a new Director of Sales hired from outside the company, announced a reorganization of the group of ten Sales Engineers, but represented that all their jobs would be safe.  Nevertheless, Plaintiff and the only other Sales Engineer over the age of fifty, Michael Newman, were laid off.  Furthermore, within a few weeks of Plaintiff's discharge, Panduit advertised for his position under a different title.

- 4 -

Plaintiff claims that Panduit knew that Plaintiff was being treated by a neurosurgeon for a problem with his back and hip.  When Panduit switched the kind of company vehicles it provided to some employees from Trail Blazer SUVs to Ford Taurus sedans, the neurosurgeon wrote a letter[2] to Panduit recommending that Plaintiff be allowed to keep his Trail Blazer to accommodate Plaintiff's disability because it provided easier access. Instead, Panduit took away the Taurus, but refused to give Plaintiff a different vehicle or a car allowance. [3] Plaintiff claims that later Kean was "uncomfortable for Plaintiff's need to rent a small sport utility vehicle when travelling and . . . with the fact that Plaintiff walked with a limp secondary to degenerative disk disease, since found out Plaintiff also has degenerative hips. [*sic*]"  #1-3 at ¶ 5.3.

---

[2] A copy is attached to #17, Ex. F.

[3] The Court observes that Plaintiff, who is represented by counsel, has not specified a cause of action under the TCHRA for discriminatory failure to make reasonable accommodation for a known disability, nor has either party addressed such a claim. *See, e.g., Feist v. La. Dep't of Justice, Office of the Att'y Gen.,* 730 F.3d 450, 452 (5th Cir. 2012).  "A wrongful termination claim under the ADA is not properly analyzed under a reasonable accommodation theory unless an employer is shown to have terminated a qualified individual with a disability in order to avoid accommodating that employee's impairments at the workplace." *Burch v. Coca-Cola Co.,* 119 F.3d 305, 314 (5th Cir. 1997).  The issue of the company car arose more than a year before Plaintiff's termination and, as will be discussed, he ultimately accepted an alternate accommodation by Panduit of his claimed disability. Moreover at his deposition when Plaintiff was asked whether around the time of his layoff in August or September of 2011 his back condition limited his ability to perform the sales engineering position, he responded, "Not one bit."  #17, Ex. A, at p.128:9-17.

While Plaintiff and Kean traveled through Iowa and Nebraska on a business trip to visit customers, Kean commented on what he perceived to be a disability of Plaintiff, i.e., the way Plaintiff was moving and bending, and Kean repeatedly stated that he ran for exercise.  Plaintiff responded that he wished he was still able to run.  Plaintiff further felt compelled to tell Kean that one day Plaintiff would have surgery to relieve his problem. #17, Bleiweiss Affid., Ex. C.  Another time Kean told Plaintiff to "back off the disability thing" because it was affecting his work. *Id.*

Plaintiff conclusorily asserts that age and disability were motivating factors in Panduit's decision to terminate him and that Panduit violated the Americans with Disabilities Act and the Age Discrimination in Employment Act.[4]

---

[4] Plaintiff filed this Petition when he initiated this case in Texas state court.  Texas pleading standards are far more lenient than federal pleading standards.  "Texas follows a 'fair notice' pleading standard, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant at trial." *Penley v. C.L. Westbrook*, 146 S.W. 3d 220, 232 (Tex. App.--Fort Worth 2004)(citing *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W. 3d 887, 896 (Tex. 2000)), [*rev'd on other grounds*, 231 S.W. 3d 389 (Tex. 2007)].  As summarized in 1 Tex. Prac. Guide Civil Pretrial § 5:39 (Database updated through September 2010):

A petition is sufficiently pleaded if one can reasonably infer a cause of action or defense from what is specifically stated. *Boyles v. Kerr*, 855 S.W. 2d 593, 601 (Tex. 1993); *In re Credit Suisse First Boston Mortgage Capital, LLC*, 273 S.W. 3d 843, 850 (Tex. App.--Houston [14th Dist.] 2008, orig. proceeding)(petition can be sufficient if a claim reasonably may be inferred from what is specifically stated, and thus, a petition is

## Applicable Law

The Texas Commission on Human Rights Act ("TCHRA"), Section 21.051 of the Texas Labor Code, provides in relevant part, "An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin or age the employer . . . discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment . . . ." Although Plaintiff's Original Petition states that he "does not assert any federal claims in this proceeding" (#1-3 at p.4), not only does his Original Petition (#1-3 at ¶ 5.5) state otherwise, but the Texas Legislature "intended to correlate state law with federal law in employment discrimination when it enacted the

---

not necessarily defective even if the plaintiff has not specifically alleged one of the elements of a claim). . . . *Woolam v. Tussing*, 54 S.W. 3d 442. 448 (Tex. App.-- Corpus Christi 2001, no pet.)(pleadings will generally be construed as favorably as possible to the pleader; the court will look to the pleader's intendment and the pleading will be upheld even if some element of a cause of action has not been specifically alleged, and every fact will be supplied that can reasonably be inferred from what is specifically stated) . . . .

*See also* 58 Tex. Jur. 3d Pleading § 102 (Database updated October 2010)("In the absence of a special exception, a pleading will be construed liberally in the pleader's favor, and every reasonable intendment will be indulged in favor of the pleading.  The court will seek to discover the intendment of the pleader; and the pleading may be upheld even if some element of the cause of action or defense has not been specifically alleged.  Every fact will be supplied that may reasonably be inferred or regarded as being implied by what is specifically stated.")(footnote citations omitted).

TCHRA." *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W. 3d 735, 739 (Tex. 2003).  Moreover, "[i]n discrimination cases that have not been fully tried on the merits, [Texas courts] apply the burden-shifting analysis established by the United States Supreme Court." *Id., citing Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See also Gold v. Exxon Corp.*, 960 S.W.2d 378, 380 (Tex. App.--Houston [14th Dist.] 1998, no writ)(In enacting the TCHRA, the Texas Legislature intended to correlate "state law with federal law in the area of discrimination in employment"; thus the same burden-shifting framework used to analyze a case under the federal discrimination statutes applies under the Texas statute.).

**TCHRA and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634**

The ADEA makes it "unlawful for an employer to fail or refuse to hire or to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  19 U.S.C. § 623(a)(1).

Regarding age discrimination, the TCHRA is coextensive with the ADEA and claims are evaluated in the same analytic framework under both statutes. *Evans v. City of Houston*, 246 F.3d 344, (5th Cir. 2001), *citing  Bodenheimer v. PPG Indus. Inc.*, 5 F.3d 955, 957 (5th Cir. 1993); *In re United Servs. Auto. Ass'n*, 307 S.W. 3d 299, 308 (Tex. 2010).  *See also Murphy v. Uncle Ben's, Inc.*, 168 F.3d 734, 739 (5th Cir. 1999)("The purpose of the [TCHRA]

- 8 -

is to coordinate and conform with federal law under Title VII and the ADEA," so the courts look to federal precedent in the absence of state decisional law), *citing Caballero v. Cent. Power & Light Co.*, 858 S.W. 2d 359, 361 (Tex. 1993).

Because an RIF is a "legitimate, nondiscriminatory reason for discharge, the Fifth Circuit has modified the *McDonnell Douglas* framework of discrimination cases in such a context. *Smith v. Houston Indep. Sch. Dist.*, No. 4:12-CV-3083, 2014 WL 4471386, at *4 (S.D. Tex. Sept. 9, 2014), *citing EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996), and *Russo v. Smith Int'l, Inc.*, 93 S.W. 3d 428, 438 (Tex. App.--Houston [14[th] Dist.] 2002).  In the context of an RIF a plaintiff cannot prove that he was replaced by a younger employee, the prima facie case of age discrimination does not require that he show such. *Amburgey v. Corhart Refractories Corp.,* 936 F.2d 805, 812 (5th Cir. 1991).  The plaintiff can establish a prima facie case in an RIF case by a minimal showing (1) that she is within a protected group, (2) that she was adversely affected by the employer's decision, (3) that she was qualified to assume another position, and (4) others who were not members of the protected class remained in similar positions. *Smith v. Houston Indep. Sch. Dist.*, 2014 WL 4471386, at *4.  *See also Amburgey*, 936 F.2d at 812 (for a *prima facie* case in a reduction case the plaintiff must show that he is in the protected age group, that he was adversely affected, i.e., discharged or demoted, by the employer's decision, that he was qualified to assume another position at the of his

discharge or demotion, and that there is sufficient evidence from
which the factfinder might reasonably conclude that the employer
intended to discriminate in reaching its decision by either (1)
refusing to consider retaining or relocating the plaintiff because
of his age  or (2) regarding age as a negative factor in its
consideration).  The Fifth Circuit finds suspicious in a RIF case
when without a plausible explanation an employer fires a
qualified, older employee, but retains younger ones.  *Id.* at 812.

Under both statutes a plaintiff may prove a claim of age
discrimination with either direct or circumstantial evidence.
*Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 377 (5th Cir.
2010); *Quantum Chem. Corp. v. Toennies*, 47 S.W. 3d 473, 476 (Tex.
2001).  If a plaintiff provides direct evidence of discriminatory
animus (as the "but-for" factor under the ADEA and as a motivating
factor under the TCHRA) in the employment decision, the burden
shifts to the defendant to prove that "'it would have taken the
same action, regardless of discriminatory animus.'"  *Maestas v.
Apple, Inc.*, ___ F.3d ___, 2013 WL 5385478, at *3 (5th Cir. Sept.
27, 2013), *citing Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d
893, 896 (5th Cir. 2002), *citing Price Waterhouse v. Hopkins*, 490
U.S. 228, 252-53 (1989); *Quantum Chem*, 47 S.W. 3d at 476 (If the
plaintiff submits direct evidence of discriminatory animus, the
burden shifts to the employer to show that "legitimate reasons
would have led to the same decision regardless of any
discriminatory motives.").  "'Direct evidence is evidence that, if
believed, proves the fact of discriminatory animus without

- 10 -

inference or presumption.'" *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003)(*quoting Sanstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002), *cert. denied*, 539 U.S. 926 (2003). "[D]irect evidence includes any statement or document which shows on its face that an improper criterion served as" "the," or "a," basis (depending upon the statute) for the adverse employment action. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003), *overturned on other grounds by Smith v. Xerox Corp.*, 602 F.3d 320, 328 (5th Cir. 2010). Remarks "relat[ing] to the protected class of persons of which the plaintiff is a member," near in time to the plaintiff's allegedly discriminatory termination, "made by an individual with authority" over that decision, and related to that decision may constitute direct evidence of discrimination. *Jackson v. Cal-Western Packing Corp.*, 602 F.3d 374, 380 (5th Cir. 2010). "In order for an age-based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was a determinative factor in deciding to terminate the employee." *Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000).

Where there is no direct evidence of age discrimination, the *McDonnell Douglas* evidentiary procedure for allocating burdens of proof applies to discrimination claims under the ADEA and the TCHRA. *Meinecke v. H&R Block of* Houston, 66 F.3d 77, 83 (5th Cir. 1995). "If an inference is required for the

evidence to be probative as to discriminatory animus in terminating [the employee], the evidence is circumstantial." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897-98 (5th Cir. 2001). Comments may also be used as circumstantial evidence of employment discrimination where made by a person who is either primarily responsible for the challenged employment action or who has influence over that decision. *Matthews v. United Brotherhood of Carpenters & Joiners of Am.*, 228 Fed. Appx. 436, 440 (5th Cir. Apr. 18, 2007), *citing Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003). If the comments are vague and remote in time or the speaker has no authority or influence over the adverse employment decision, they are merely stray remarks insufficient to establish discrimination. *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996).

In a suit for age discrimination, the plaintiff must first establish a *prima facie* case of discrimination: the plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within a protected class (at least forty years of age, 29 U.S.C. § 631(a)) at the time of the discharge; and (4) he was either replaced by someone younger, or otherwise discharged because of his age. *Bodenheimer*, 5 F.3d at 957. *See also Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 39, 41 (5th Cir. 1996)(In a reduction-in-force case grounded in the ADEA, a plaintiff must establish a *prim facie* case of age discrimination by showing "(1) that he is within the protected age group; (2) that he has been adversely affected by the employer's

decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) 'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.'").

The TCHRA does differ from the ADEA in the causation standard: the ADEA requires evidence that age was the "but-for" cause of the adverse action, while the TCHRA applies a less strict standard, i.e., that age was a "motivating factor" in the adverse decision. *Julian v. City of Houston*, No. 4:12-CV-2973, 2014 WL 3795580, at *4 (S.D. Tex. July 31, 2014), *citing Quantum Chem*, 47 S.W. 3d at 480; *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 737-38 (S.D. Tex. 2014)(The "'motivating factor' analysis' does not apply to the ADEA."), *citing Smith v. Xerox*, 602 F.3d 320 (5th Cir. 2010).

While only those forty years or older are protected by the ADEA, the statute prohibits age discrimination against them not on the basis of class membership, but on age. *O'Connor v. Consolidated Caterers Corp.*, 517 U.S. 308, 313 (1996)(holding that an inference that the employment action was based on a discriminatory motive cannot be drawn where one worker is replaced by another who is not significantly younger but outside the protected class; instead the person replacing the plaintiff must be "substantially younger."). Thus if one member of the class loses out to another member of the class, that fact is irrelevant as long as the first lost out because of his age. *Id*. Nor is

there a greater inference of age discrimination when a forty-year-old loses out to a thirty-nine-year-old than when a fifty-six-year-old loses out to a forty-year old.  *Id*.  Instead the court looks at a more reliable indicator, i.e., whether the plaintiff was "substantially" older than the replacement employee.  *Id*.  Courts have held that a five-year difference between an employee and his replacement is insufficient as a matter of law to create an inference of discrimination.  *Cramer v. Intelidata Techs. Corp.*, No. 97-2775, 1998 WL 911735, at *3 (4th Cir. Dec. 31, 1998); *Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998).

The Fifth Circuit has held that a plaintiff's subjective belief that he was discriminated against is insufficient to establish a *prima facie* case of discrimination under Title VII, the TCHRA, or the ADEA.  *Vasquez v. Nueces County, Texas*, 551 Fed. Appx. 91, 94 (5th Cir. Dec. 19, 2013)("The only evidence offered to support her complaint is her own affidavit asserting that the motivation for her termination was her age, gender, national origin or race."), *citing Baltazor v. Holmes*, 162 F.3d 368, 377 n.11 (5th Cir. 1998).

If the plaintiff succeeds in establishing a *prima facie* case, it raises a presumption of discrimination.  *Sullivan v. Worley Catastrophe Services, LLC*, ____ Fed. Appx. ____, No. 14-30187, 2014 WL 6306710, at *2 (5th Cir. Nov. 17. 2014), *citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).  The burden of production then shifts to the defendant, who or which

- 14 -

must then articulate a legitimate, non-discriminatory reason for the termination. *Id.* at *3*, citing Nichols*, 81 F.3d at 41. The defendant may satisfy this burden by proffering evidence that "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id., citing St. Mary's Honor Ctr.*, 509 U.S. at 507. The employer is not required to prove that it was actually motivated by these proffered reasons, nor must it demonstrate an absence of discriminatory motive.  If the employer succeeds, the presumption of discrimination falls away and the plaintiff must satisfy the burden of persuasion on the question of intentional discrimination by proving by a preponderance of the evidence that the employer's reasons are pretextual and that the discharge was motivated by intentional age discrimination. (As discussed, under the ADEA the plaintiff must show that age was the "but-for" cause of the challenged employment action, while the TCHRA permits a mixed motive, i.e., only one of the reasons for the action.) *Id.*; *Assariathu v. Lone Start Health Management Associates, LP*, 516 Fed. Appx. 315, 318 (5th Cir. Mar. 6, 2013).[5] "Pretext may be shown by 'any evidence which demonstrat[es] that the employer's proffered reason is false' or 'unworthy of credence.'" *EEOC v.*

---

[5]     Unlike the TCHRA, the ADEA requires "but for" causation rather than age being "a motivating factor." *Jackson v. Host Intern., Inc.*, 426 Fed. Appx. 215, 219 n.2 (5th Cir. Feb. 1, 2011); *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 168 (2000); *Moss v. BMC Software, Inc.*, 610 F.3d 917, 928 (5 [th] Cir. 2010) ("to the extent that [plaintiff] alleges that discrimination was a motivating factor--rather than the 'but for' cause--in [defendant's] decision not to hire him, his claims must fail.").

*DynMcDermott Petroleum Operations Co.*, 537 Fed. Appx. 437, 446 (5th Cir. July 26, 2007), *citing Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,* 482 F.3d 408, 412 & n.11 (5th Cir. 2007). Although the burden of production shifts, the plaintiff always retains the ultimate burden of persuasion that there is a nexus between his termination and his age. *St. Mary's Honor Center*, 509 U.S. at 514-17; *Odom v. Frank*, 3 F.3d 839, 850 (5th Cir. 1993).

### TCHRA and the Americans With Disabilities Act ("ADA")

Section 21.105 of the Texas Labor Code, like the ADA, 42 U.S.C. § 12112(a), makes it unlawful for an employer to discriminate against an employee on the basis of a disability that does not impair the individual's ability to reasonably perform a job. *Holloway v. ITT Educational Services, Inc.*, No. Civ. A. H-13-1317, 2014 WL 4273896, at *7 (S.D. Tex. Aug. 28, 2014). "Given the similarity between the ADA and the TCHRA, Texas courts 'look to analogous federal precedent for guidance when interpreting the Texas Act.'" *Rodriguez v. ConAgra Grocery Products Co.*, 436 F.3d 468, 473-74 (5th Cir. 2006), *quoting NME Hospitals, Inc. v. Rennels*, 994 S.W. 2d 142, 144 (Tex. 1999); *Williamson v. National Ins. Co.*, 695 F. Supp. 2d 431, 452 (S.D. Tex. 2010)(collecting cases).

Title I of the ADA, 42 U.S.C. § 12112(a), prohibits discrimination against an employee on the basis of physical or mental disability and requires an employer to make reasonable accommodations necessary to allow an employee with a disability to perform the essential functions of her job unless the

accommodation would impose an undue hardship on the employer. Section 12112(a) of the ADA provides that no covered entity shall "discriminate" against a qualified individual with a disability because of the disability of such an individual in regard to, *inter alia*, "the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." In addition, Section 12112(b)(5) states that the term, "discriminate," includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operations of the business of such covered entity."

"A qualified individual with a disability" is defined as "an individual with a disability  who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  A disability is "(A) a physical or mental impairment that substantially limits one or more of the major activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."

The ADA, as amended by the ADA Amendments Act of 2008 ("ADAAA"), Public Law No. 110-325, 122 Stat. 3553 (Sept. 25, 2008), by its express language became effective on January 1, 2009, while the final regulations issued by the EEOC became effective on May 25, 2011.  76 Fed. Reg., 16978, 16999 (2011). The ADAAA broadened the ADA's original definition of "disability,"

"substantially limits," "major," and "regarded as" by adding 42 U.S.C. § 12102(2)-(4). *Neely v. PSEG Texas, Ltd. Partnership*, 735 F.3d 242, 245 (5th Cir. 2013).

The TCHRA was amended in 2009 to expand its coverage in accordance with that of the ADA.  H.R. 978, 81st Leg., Reg. Sess. (Tex. 2009); *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 993 (W.D. Tex. 2012)(discussing the amending and expansion of the TCHRA); *Gardea v. DialAmerica Marketing, Inc.*, No. WP-12-CV-158-KC, 2013 WL 1855794, at *10 (W.D. Tex. 2013); *Carbaugh v. Unisoft Intern., Inc.*, 2011 WL 5553724, at *7-8 (S.D. Tex. Nov. 15, 2011).

Because Plaintiff's termination occurred on September 30, 2011 these amendments apply here.  "The ADAAA is principally aimed at reversing Supreme Court precedent perceived as improperly narrowing the scope of protection originally intended by drafters of the ADA.[6]"  Louis P. DiLorenzo, *The Intersection of the FMLA and ADA--As Modified by NDAA, ADAAA and GINA*, 860 PLI/Lit 47, 83-84 (June 23, 2011); 29 C.F.R. § 1630.1(c)(4)("reinstating a broad scope of protection under the ADA"; "the definition of

---

[6] Previously the ADA was construed as providing that an employee is not disabled if his impairment is corrected by a mitigating measure to the point where it does not substantially limit a major life activity (e.g., by insulin given to a diabetic) and that an impairment rises to the level of a disability only if its impact is "permanent or long term."  *See Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999)(requiring a court to take into account the ameliorative effects of mitigating measures in determining whether there was a disability) and *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002)(narrowly construing and strictly interpreting the term "disability.").  Both these cases were abrogated by the ADA Amendments Act of 2008 ("ADAAA") (*see infra*).

'disability' shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA"). The EEOC emphasized that "the primary object of attention in cases . . . should be whether the covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4).

Moreover "the ADA does not relieve a disabled employee or applicant from the obligation to perform the essential functions of the job." *Wilkerson v. Boomerang Tube, LLC*, 2014 WL 5282242, at *6 (E.D. Tex. Oct. 15, 2014), *quoting Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 808 (5th Cir. 1997)("To the contrary, the ADA is intended to enable disabled persons to compete in the work-place based on the same performance standards and requirements that employers expect of persons who are not disabled."), *cert. denied*, 522 U.S. 1115 (1998). In determining whether a person is "qualified," the court examines "'(1) whether the individual meets the necessary prerequisites for the job, such as education, experience, skills and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation.'" *Id., citing id.* Therefore to avoid summary judgment the plaintiff must demonstrate "(1) that he can perform the essential functions of the job despite his disability; or (2) if he his unable to perform the essential functions of the job, that a reasonable accommodation by the employer would enable him to perform those functions." *Id.,*

*citing Crossley v. CSC Applied Technologies, LLC*, 569 Fed. Appx. 195, 198 (5th Cir. May 22, 2014).  The ADA does not require an employer to reassign the employee to an occupied job, create a new job, eliminate essential functions of a job, or assign existing employees or hire new employees to perform the functions of the employee's job that the employee could not perform.  *Wilkerson*, 2014 WL 5282242 at *7, *citing inter alia Toronka v. Continental Airlines, Inc.*, 411 Fed. Appx. 719, 724 (5th Cir. 2011)("It would not be a reasonable accommodation to require the employer to eliminate essential job functions, modify job duties, reassign existing employees, or hire new employees.").

To state a claim under § 12102(1), a plaintiff must allege that he has a disability, i.e., "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."  Section 12101(2)-(4), recently added by the ADAAA, provides in relevant part,

(2) Major life activities

(A) In general

For purposes of paragraph (1) major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

(4) Rules of construction regarding the definition of disability

(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major activity need not limit other major life activities in order to be considered a disability.

(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major activity when active.

(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

(II) use of assistive technology;

(III) reasonable accommodations or auxiliary aids or services; or

(IV) learned behavioral or adaptive neurological modifications . . . .

A covered employer must provide reasonable accommodations to an otherwise qualified person with a disability unless the employer can show that the accommodation "would impose an undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). The plaintiff bears the burden of requesting reasonable accommodations. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007). "'The employee who needs an accommodation because of a disability has the responsibility of informing her employer.'" *Griffin, Sr. v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011), *quoting EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009). "'[W]here the disability,

resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.'" *Id., citing id.* If the employee does so, "'the employer and the employee should engage in a flexible, interactive discussion to determine the appropriate accommodation.'" *Id., citing EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009). While the employee has a right to a reasonable accommodation, the right is not to his preferred accommodation. *Id., citing id.* "'The employee bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform.'" *Id., quoting Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007). "'A disabled employee has no right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously.'" *Id., quoting id.* at 316. "'[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA.'" *Id., quoting Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1999). "'[A]n employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal interactive' process is traceable to the employee and not the employer.'" *Id., quoting id.*

Mitigating measures (such as medications, medical devices and assistive technology) are ignored when assessing whether an impairment substantially limits a person's major life activities. ADA Amendments Act of 2008, Sec. 4 § 3(4)(E)(1), 122 Stat. 3553, 3556.  Moreover, the court may consider the negative effects of a mitigating measure, e.g., effects of medication, in determining whether the individual is substantially limited in a major life activity.

Furthermore, individuals who are "regarded as disabled," but who do not actually have a disability, only need to show that they were subjected to an action prohibited by the statute, and no longer that the disability substantially limited them in a major life activity.  Employers need not provide reasonable accommodations to those employees only "regarded as" having a disability.  ADA Amendments Act of 2008, Sec. 6 § 501 (l)(h), 122 Stat. 3553, 3558.

**Panduit's Motion for Summary Judgment (#15) and Memorandum (#16)**

Panduit identifies the issue in this litigation as whether Plaintiff Freddie Bleiweiss was impermissibly chosen for a layoff in a business reorganization based on his age and/or disability.  Panduit argues that Plaintiff fails to present any direct or circumstantial evidence of discrimination based on either age or disability.

Panduit, a manufacturer and provider of network and electrical solutions for its customers, hired Plaintiff on or around January 3, 2006 when he was fifty-two years old and

- 24 -

employed him as a systems sales engineer ("SSE") until October 1, 2011, when he was 58.  #16, Ex. A, Decl. of Melissa Fideli[7] at ¶¶ 3 and 12; Ex. B, Plaintiff's Dep. at 30:2-5; Ex. C, Probationary Employee Notification Form.[8]  He was employed as part of the "technical sales team," which was then organized by regions (west coast, Chicago area, south central, New York, and central region). Each region had a vice president of sales overseeing an SSE, an application engineer ("AE"), and a technical sales manager for the applicable geographic territory.  Plaintiff, as the SSE for the central region, was responsible for aiding the sales force in selling a software product designated as "PIM."  #16, Declaration of  Melissa Fideli, Ex. A at ¶ 3; Plaintiff's Dep., Ex. B at pp. 34:13-7, 36:17-21, and 41:17-25.[9]  Plaintiff testified that the job of the AE on the team required a different set of skills than that of an SSE and focused on the electrical side of the business.

---

[7] At times Fideli is called Melissa Prochot, her married name.

[8] Citations in the discussion of Panduit's motion for summary judgment are all to Defendant's summary judgment evidence, attached to #16, unless otherwise indicated.

[9] In his response in opposition to the motion for summary judgment, Plaintiff states that PIM was only one of his job duties and that he also (1) supported the Management Network Services Group ("MNS"), which focused on Panduit products from RiT Technologies, (2) designed "data centers, including mapping the cabling infrastructure in data centers and mapping the network architecture to physical connectivity," and (3) performed all the job functions set out in the SSE job description (Ex. B to #17). #17 at p. 3.

Ex. B at p. 42:4-19; Kean Dep., Ex. D at p. 12:19-25. [10]  The regional technical support manager ("RTSM") position also required different skills and had duties distinct from those of the SSE. Ex. A at ¶ 3; Ex. B at p. 42:19-25.  As the SSE for the Central Region, Plaintiff reported to regional manager Phil Taylor, prior to the hiring of Kean and the restructuring of the company.  Ex. B at pp. 38:6-10, 45:6-9, and 47:20-22.

When the company decided to restructure its national sales division in March 2011, Panduit first created a position titled Director of Solution System Engineering ("Director"), hired Kean for the job to realign the department, simultaneously eliminated the regional structure for the technical sales team (which was comprised of SSEs, AEs, and RTSMs), and replaced it by having all technical sales staff report to that one Director.  Ex. B at pp. 63:15-64:10; Kean Dep. Ex. D at pp. 4:23-5:5, 10:12-21, 21:17-22:3.  The fifteen employees, including SSEs, AEs, and RTSMs, who reported to Kean were Plaintiff (age 58), Steve Turvey (33), Mike Mazzotta (46), Jeff Yeary (48), Sam Samaniego (50), Jorge Labrada (48), Mike Newman (50), Kevin Hogan (42), Jason Campbell (36), Chris Woods (54), John French (58), Ray Brauer (53), Herman Bassett (51), James Lynch (46), and Michael Healey

---

[10] During his deposition Kean testified that the difference between an SSE and an AE was that an SSE "focused on our network side of the business, and the application engineer focused on the electrical side of the business."  #17, Ex. E at p. 12:16-25.

(53).[11]   Ex. A ¶ 10; Ex. D at pp. 16:13-18:7; and business records, Ex. F.   Panduit gave Kean free reign to use his knowledge and experience to reorganize by consolidating and creating a focus around the technical engineers, a group that would become known as the technical systems engineers ("TSE").

Instead of by regions, Kean wanted to realign the sales team to be borderless and to be organized around three different markets, or "solutions," with products to span across all three: the data center, enterprise (office buildings), and industrial. Ex. D at pp. 33:1-12, 36:20-24.   Kean created a Technical Support Engineer ("TSE") position, which would be a pre-sales support position for the sales staff in each of the three markets.   Ex. D at p. 33:10-17.   He also created a post-sales position for a support engineer.   These new positions would not be product-focused, i.e., on software, network or electrical products, as had previously been the case for the SSEs and AEs.   Ex. D at p. 41:9-19.   Furthermore, Kean eliminated the SSE positions.   Ex. E at ¶ 6.

Over the next six months Kean assessed the new structure, identified the positions and the job requirements needed for them, reviewed geographical business needs, and considered which current SSEs and AEs could fill the new jobs. Kean Dep., Ex. D at 37:16-25.   He met with current members of the technical sales team as a group and individually, traveled with

---

[11] Stated ages were the employees' ages at the time of the reorganization.

each member to assess his skill set, and issued self-assessments to each to decide what skill set was needed in making reorganization staffing decisions. Of the technical sales team reporting to Kean, only Plaintiff did not complete the requested self-assessment. Ex. D at p. 52:20-53:5; email communication from Plaintiff to Kean, Ex. G. Kean used these self-assessments to prepare a detailed job skills analysis of the fourteen employees in his department, which scored the employees on the skills determined to be necessary for the new positions. Ex. D at pp. 50:19-51:16; Kean's job skills assessment, Ex. H.; Ex. F, a spreadsheet which identifies employees' points/score based on length of service and cumulative performance review for the last two years. The SSE position was eliminated, and the employees who were retained would be classified as either TSEs or support engineers. Ex. D at p. 38:12-25.

The reorganization negatively impacted three employees in the technical sales team: Ray Brauer and Mike Newman, who had the lowest scores based on the skills assessment and length of service/performance reviews (Exs. F and H), and Plaintiff because Kean determined from his analysis and observing and talking to Plaintiff that Plaintiff's skills and experience related only to the software or network side of the business (DCIM, or data center infrastructure manager or management), and that he lacked necessary skills in other areas such as labeling standards, power and grounding standards, hands-on experience with fiber (fiber optic cable, fiber optic connectivity, etc.), copper connectivity,

and computational fluid dynamics.  Ex. D at pp. 41:2-42:1, 42:1-
25, 43:8-25, 44:11-14, 48:12-24.  Panduit focused on product that
can be seen and touched, designated by the industry as "layer 1,"
while Plaintiff's strengths were in the network/software side of
data centers, or "layer 2."  Ex. D at pp. 44:1-14; Ex. e at ¶ 2.
With the elimination of the SSE position, Kean selected these
three employees (Brauer, Newman, and Plaintiff) to be laid off, a
decision that was reviewed by his superiors and by human
resources.[12]  At his deposition, Kean testified that he was the
"ultimate decision-maker" and identified the superiors who
reviewed the layoff decision as Vice President of North American
Sales Deb Huttenburg, Senior Vice President of Sales Pete
Kokuzian, and Human Resources' Melissa Fideli.  #16, Ex. D at pp.
34:1-35:22.  The three employees to be laid off were notified of
their terminations on September 26, 2011 (Termination Notice, Ex.
I).

 Plaintiff now works as a solutions engineer with Nlyte
Software and assists the sales team in the technical aspects of
the single software product that the company sells.  Ex. B at pp.
11-12.

 While he was employed at Panduit, Plaintiff had a lower
back problem, which, after his termination, he learned in January

---

 [12] During his deposition Kean conceded that Huttenburg
and Kokuzian's input was "more of a rubber stamp review, yeah, on-
-based on my decision," while Fideli's role was limited "to
help[ing Kean] communicate to the employees what was going to
happen."  #17, Ex. E at p. 54:4-6, 55:9-16.

2012 was the result of two degenerated hips.  Ex. B at pp. 27-28.
Plaintiff stated that while at Panduit he had mobility
difficulties, at times causing him to walk with a limp and/or
cane.  Ex. B at p. 121:11-24.[13]  Panduit states that Kean did not
make any direct statements about Plaintiff's physical abilities or
disabilities, but that Plaintiff perceived that when Kean observed
Plaintiff having problems, Kean would make affirmative statements
about Kean's own physical abilities.  Ex. B at pp. 93:15-95:5,
97:17-23.  The sole example that Plaintiff could remember was on
a sales trip that Kean and Plaintiff took together around the
summer of 2011.  Ex. B, at pp. 94:15-95:5, 97:17-23.  At the
check-in at a hotel, after Plaintiff dropped a pen and claimed he
had problems trying to bend down to retrieve it, Kean told
Plaintiff that he, Kean, was going to go jogging that evening.
Ex. B at pp. 94:6-95:5.  Plaintiff further alleges that on that
same trip Kean asked why Plaintiff rented an SUV because Kean was
concerned about the travel expense of the rental.  Ex. B at pp.
95:6-16.  96:6-20.[14]

---

[13] The Court observes that during Plaintiff's deposition
when he was asked whether around the time of his layoff in August
or September of 2011 his back condition limited his ability to
perform the sales engineering position, he responded, "Not one
bit."  #17, Ex. A, at p.128:9-17.

[14] The Court observes that these two remarks clearly are
not "direct and unambiguous, allowing a reasonable jury to
conclude without any inference or presumption that age was
determinative factor in deciding to terminate" Plaintiff so as to
be probative of discriminatory bias against Plaintiff's
disability.  *Wyvill*, 212 F.3d at 304.

That same summer there was an event in Chicago that offered among other social activities riding in bumper cars, for which attendance was not required.  Ex. B at pp. 124:9-21; Ex. D at pp. 66:3-13, 22-67;20.  Plaintiff states that when Kean asked him why he was not participating in the bumper car event, Plaintiff responded that the activity would not be good for his back.  Ex. B at p. 126:15-22; Ex. D at p. 66:14-25.[15]  Kean made no other statement about Plaintiff's physical abilities.  Ex. B at pp. 126:23-127:12.

Panduit maintains, and Plaintiff does not claim otherwise, that Kean never made a direct statement to Plaintiff about his age.  Ex. B at p. 93:1-4.

A plaintiff alleging age or disability discrimination where a reorganization or reduction in force is involved must make a *prima facie* showing (1) that he is in a protected group, (2) that he was adversely affected by the employer's decision, (3) that he was qualified to assume another position at the time of discharge, and (4) evidence, either circumstantial or direct, from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching its decision.  *Love v. Hajoca Corp.*, No. Civ. App. 4:11-1192, 2013 WL 4875045, at *4 (S.D. Tex. Sept. 11, 2012), *citing Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 (5th Cir. 1996), *appeal dismissed*, 13-20613 (5th Cir. Apr. 22,

---

[15] Nor is this statement sufficiently direct to be probative of disability discrimination.

2014).  Panduit maintains that Plaintiff has not and cannot satisfy the third and fourth elements of a *prima facie* case.

Plaintiff concedes that Kean, the decision-maker for the reorganization and accompanying lay-offs, made no direct comments about his age, nor is there any other direct evidence of discrimination.  Plaintiff's only evidence is his claim that "everybody else over 50 that worked for Tom Kean" was either laid off or demoted.  Ex. B at pp. 89:5-90:15.  Panduit highlights the fact that Plaintiff omits mentioning that John French, age 58, was selected at the time for a new TSE position, as were Christopher Woods (54) and Hermann Bassett (51), while Sam Samaniego (51) was retained in a post-sales role.  Ex. A, ¶ 11; Ex. E at ¶ 7.  Of the fourteen employees considered by Kean for layoff in the reorganization, twelve were over the age of 40 and the average age of the group was 50; Ex. E at ¶ 7.

Furthermore if Plaintiff argues that younger employees should have been chosen for layoff, he fails to satisfy the requirement in a reduction force case to show that younger employees were "clearly less qualified."[16]  *Love*, 2013 WL 4875045

---

[16]  Regarding the third step of the *McDonnell Douglas* shifting burden framework, to raise a genuine issue of material fact as to whether the employer's articulated reason for the discharge was pretextual, the Fifth Circuit has opined that a showing that the plaintiff was "'clearly better qualified' (as opposed to merely better than or as qualified [as]) the employees who are selected' will be sufficient to prove that the employer's proffered reasons are pretextual."  *Moss v. BMC Software, Inc.*, 610 F.3d 917, 923 (5th Cir. 2010), *quoting EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1444 (5th Cir. 1995).  Furthermore, "'unless the qualifications are so widely disparate that no reasonable employer would have made the same decision,'" any

at *7, *citing Texas Instruments*, 100 F.3d at 1181.  In addition
Plaintiff fails to submit any evidence to controvert the skills
assessment made by Kean, which demonstrates that age was not a
factor in the choice to lay Plaintiff off.

　　　　Even if Plaintiff had made a *prima facie* case, Panduit
has articulated a legitimate, nondiscriminatory reason for
discharging him, and Plaintiff has provided no evidence to suggest
that Panduit's reorganization plan that hired Kean or the
assessment process carried out by Kean were motivated in whole or
in part by discriminatory animus based on age.   Nor can Plaintiff
prove pretext for discrimination for each of Panduit's proffered
reasons for his layoff.   Instead Plaintiff simply claims that his
position was not eliminated, that others are performing his job,
and that some unknown person was hired for his position.

　　　　As support for Plaintiff's disability claim, Plaintiff
asserts that three "facts" support it:  (1) He "was periodically
making noise about . . . the lost benefit [the company car switch
from an SUV to sedan]"[17]; (2) "[I]t was obvious to a lot of people

_____

"'differences in qualifications are generally not probative
evidence of discrimination'"; "'the bar is set high for this kind
of evidence.'"   *Moss*, 610 F.3d at 923, *citing Celestine v.
Petroleos de Venezuella SA*, 266 F.3d 343, 357 (5th Cir. 2001).
Thus to show that he was "clearly better qualified" than the
individual(s) who got the job(s), the plaintiff must submit
"evidence from which a reasonable jury could conclude that 'no
reasonable person, in the exercise of impartial judgment, could
have chosen the candidate selected over the plaintiff for the job
in question.'"   *Id. citing Deines v. Texas Dep't of Protective &
Regulatory Servs.*, 164 F.3d 277, 280-81 (5th Cir. 1999).

[17] Panduit points out the change from the Trail Blazer
SUV to the Taurus sedan was made for all employees who were

- 33 -

that [he] either needed a cane to help him walk or [he] had a mobility problem and it was very easy to see [him] limping down the hallways."; and (3) Pete Kokuzian, a sales executive and host of the Chicago event, who was not involved in the layoff decision,

---

eligible for a company vehicle and the substitution was made for economic and environmental reasons. Ex. A at ¶ 4; Ex. B at pp. 98:18-99:25, 100:18-lo1:1. Moreover, when Plaintiff asked to be allowed to retain an SUV, as an alternative accommodation Panduit offered to pay for a seat modification if Plaintiff chose the sedan, or, alternatively, if he chose to purchase his company SUV as his personal vehicle, Panduit would reimburse Plaintiff for any mileage he incurred for business purposes. Ex. A at ¶ 7. According to Panduit Plaintiff rejected the offer and insisted that he be paid a car allowance or some monthly stipend that he thought would make up for the lost benefit. Ex. B at pp. 102:15-103:11. (Panduit insists that he did not refuse to take the offer of a seat modification, but that after multiple attempts he was unable to find a seat cushion for the sedan that relieved his pain. #17 at p. 6.) Panduit denied his request for a car allowance in the Fall of 2010, nearly a year before it decided to bring Kean into the company. Ex. A at ¶ 8; Ex. B at pp. 132:22-133:2. Thus not only is there a lack of evidence connecting his layoff by Kean to the car allowance decision, but there is not the close temporal proximity required to establish causation for a *prima facie* case. *See, e.g., Carroll v. Sanderson Farms, Inc.* H-10-3108, 2012 WL 3866886, at *4 (S.D. Tex. 2012)(even three and four-month time periods have been deemed insufficient for proximity within the context of retaliation under the FMLA, ADA and TCHRA); *see also Gober v. Frankel Family Trust*, 537 Fed. Appx. 518, 523 (5th Cir. July 31, 2013)("Even though suspicious timing can be evidence of pretext, it is sufficient to survive summary judgment only when combined 'with other significant evidence of pretext.'"), *citing Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). Moreover, all this took place nearly a year before the layoff. Panduit argues that Plaintiff has not submitted any evidence that the reorganization was pretextual.
      As for Plaintiff's assertion that he "continued to make noise" about the lost car benefit as evidence that he was laid off because of his disability, Plaintiff testified that a few weeks after Kean assumed his position, Plaintiff again asked Kean about getting a car allowance, but Kean referred Plaintiff to human resources since the original denial occurred before Kean's arrival at Panduit. Kean and Plaintiff did not discuss the request further. Ex. B at p. 133:5-11.

was "upset that [Plaintiff] would not play basketball bumper cars at a social event and Plaintiff "had to explain to him that the impact of bumper cars was not conducive to my good health." Ex. B at pp. 121:7-24, 123:22-124:8.  Panduit insists that Plaintiff fails to make a *prima facie* case of disability discrimination because there is no evidence that he was laid off because of his disability; instead he offers only "vague perceptions and subjective assumptions based on his own comfort or lack there of with his limitations." #16 at p. 12.  For instance he alleges that Kean made statements about his own athleticism or activities at times that Plaintiff believes Kean perceived Plaintiff as struggling physically.  Ex. B at p. 93:5-19'.  Plaintiff conceded that Kean made no direct statements about Plaintiff's abilities or disabilities.  Ex. B at p. 97:10-13.

Plaintiff cannot establish a *prima facie* case of disability discrimination based on "conclusory allegations . . . or subjective beliefs and feelings." *Michael v. City of Dallas*, 314 S.W. 3d 687, 692 (Tex. App.--Dallas 2010).  Furthermore, a reorganization or reduction in force is a legitimate nondiscriminatory reason for termination for both the age and the disability discrimination claims.  *Texas Instruments*, 100 F.3d at 1181; *Holloway*, 2014 WL 4273896, at *10.

### Plaintiff's Response (#17)

The Court does not repeat statements that are essentially in accord with Panduit's representations.

- 35 -

Insisting that he had all the skills necessary to perform the functions of the new positions established as part of Panduit's reorganization, Plaintiff contends that the old and new positions have substantially the same functions and requirements.

Plaintiff claims that while Kean was the ultimate decision maker in Plaintiff's termination, Deb Huttenberg, Pete Kokuzian (Senior Vice President of Sales), and Melissa Fidelli (Human Resources) also participated in the decision, but does not further allege or show that they in any way discriminated against him based on his age or disability.

Citing a presentation entitled "Technical Sales Transformation, September 2011" (Ex. J), Plaintiff charges that at the time of his discharge Panduit was extremely busy and actually needed more employees to meet customer demands, certainly not an economic condition justifying a reduction in force.  He cites an organizational structure chart showing that at the time of his and two other SSE's terminations, there were five open positions.  Ex. K.[18]

Regarding Kean's testimony that the reorganization involved the creation of two new kinds of positions, TSEs in pre-sales and support engineers in post-sales, Plaintiff claims that

---

[18] The Court notes that Panduit claims that it effected the reorganization not because of the economy, but in order to consolidate its sales division for more efficient matching of the skills of Panduit's technical staff with the three "solutions" (the data center, the enterprise, and the industrial) on which the business was focused and to consolidate operations.  #16, Kean Dep., Ex. D at pp. 33:1-12 and 36:20-24.

- 36 -

before the reorganization SSEs performed both functions within
that one position.  See chart on p. 9 of #17.  While Panduit
maintains that the "new positions would no longer be product
focused, i.e., on software products, network products or
electrical products," the TSE job description recites that a TSE
must "understand the advantages and disadvantages of passive and
active management; understand the role of hardware and software in
the infrastructure management solution; and software in the DCIM
solution."  Panduit's motion for sum. j. at p. 4; TSE Job
Description, Ex. L.  The job description further requires that TSE
"to understand Panduit product specifications, industry
specifications such as ANSI/EIA/TIA, ISO, IEEE, NEC and BICSI," in
other words the technical and product knowledge that Plaintiff
asserts he possessed and which Panduit claims was not part of the
new position.  Ex. L.

     As for allegations that Kean met with all current
members of the technical sales team, traveled with them
individually to assess their skills and, in his case, deficiencies
(Kean Dep., Ex. E, 45:9-48), and gave self-assessments to all in
order to discover their skill sets, Plaintiff disagrees.  He
states that Kean never met with him individually and that the
single time Kean ever observed his work was during a two-day
business trip.  Plaintiff's Affid., Ex. C at p.2.  Nor did Panduit
explain the standard for determining what score the employees
received on the job skills assessment categories.  As an example,
Plaintiff notes he was rated a "3" in the "Ability to read,

analyze, and interpret technical journals and engineering specifications," but Kean never observed Plaintiff nor spoke to him regarding this skill.

Plaintiff also states that even before he was hired by Panduit, he had extensive knowledge of the areas which Panduit named as ones in which he lacked skills or experience, i.e., labeling standards, power and grounding standards, fiber (fiber optics, connectivity, etc.), copper connectivity, and computational fluid dynamics. Resume of Qualifications, Ex. M. He claims that he was expert in layer 1 infrastructure, which included the sale of Panduit products on Panduit's Physical Infrastructure Systems composed of copper systems, fiber optics systems, power over Ethernet, zone cabling, wireless, outlets, PIM software, overhead and under floor routing, cabinets, racks, cable management, grounding and bonding, labeling and identification, and cable management accessories. Plaintiff's Affid., Ex. C at p.1, ¶ 2. Even though in the resume he submitted in applying for the SSE position he had indicated that he had over twenty years of Systems/Pre-Sale Engineering and Management Experience, over ten years of Operation and Building Network and/or Data Operation Center Experience, and over ten years of Software Presales Experience, plus numerous other relevant skills, certifications and experience, Panduit still incorrectly states that he did not work in any of these areas. *Id.* Plaintiff further charges that the survey used by Kean to determine who was qualified for the new positions, which Plaintiff voluntarily chose not to complete and

submit, was not applicable to any of the functions of an SSE and was never before used to assess the skills of one; instead it is used for electricians/cable installers that work as contractors to resell and install Panduit products.  *Id.*; Actual PCI Survey Ex. N.[19]  For this reason, when Kean required all his SSEs to complete the survey, Plaintiff claims that he merely asked for clarification on how to respond,[20] and that Kean ignored his inquiry.

Lastly, Plaintiff contends that the only persons terminated or demoted as a result of the purported reorganization were over forty years of age: Michael Newman (50); Sam Samaniego (50); Jeff Yeary (48).[21]

---

[19] Plaintiff quotes the responses of other SSEs to the survey in an effort to show that they lacked the skills or felt inadequate to perform such tasks.  Exs. O, P, Q, R, S.

[20] Panduit responds that the email, #16, Ex. G, from Plaintiff to Kean regarding Kean's request that everyone  complete the survey demonstrates that Plaintiff did not seek clarification. Rather, and indeed reflecting his deficiencies for the newly created positions, Plaintiff responded,

> This is a very poorly written survey with multiple compound questions.  I have not had hands on Panduit fiber training (except for inviting myself to a PCI training session given by Sam Samaniego).  I have worked with fiber in the past (prior to Panduit) but not to the level implied in the survey.  I was hired for my software, systems, data center, consulting and business expertise not my ability to splice and terminate fiber at a "high yield."

[21] As Panduit shows, Samaniego and Yeary were offered and accepted the new position as support engineers upon the elimination of the SSE position.  While Plaintiff calls this a "demotion," the SSE and AE positions had been eliminated and these

**Panduit's Reply (#18)**

Panduit replies that Plaintiff's response is composed of unsupported factual assertions, impermissible hearsay, immaterial issues of fact, a misunderstanding of the reorganization, an inability to recognize his own shortcomings as identified by Kean as director of the reorganization, subjective assertions that he was better qualified to assume one of the new positions, and incorrect assertions that the old and new positions were the same. Moreover Plaintiff has no direct or circumstantial evidence of either age or disability discrimination.  The mere existence of an alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *U.S. Fidelity & Guar. Co. v. Wigginton*, 964 F.2d 487, 489 (5th Cir. 1992).  A genuine issue of material fact sufficient to defeat a summary judgment requires that the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Royal v. CCC & Tres Arboles, LLC*, 736 F.3d 396, 400 (5th Cir. 2013).  "Material facts" must be "facts that might affect the outcome of the suit under governing law." *U.S. Fidelity*, 964 F.2d at 489.

Plaintiff's unsupported factual allegations that the business climate required more, not fewer employees fail to undermine the purpose of the Panduit reorganization, which was not in response to a poor or a booming economy, but to better and more

---

two qualified and accepted the new, available positions.

- 40 -

efficiently match the skills of Panduit's technical staff with the three "solutions" (the data center, the enterprise, and the industrial) on which the business was focused and to consolidate operations.  #16, Kean Dep., Ex. D at pp. 33:1-12 and 36:20-24. Plaintiff has not submitted any evidence raising a genuine issue of material fact regarding this legitimate reason for the reorganization articulated by Panduit.  He has conceded that he knew a reorganization was about to occur and that Kean was hired as part of that process, but was largely kept in the dark about it.  #17, Ex. A at p. 64:1-22.  If Kean did tell the team initially that all the current SSEs' jobs would be safe, as Plaintiff claims, his objection that it was false is not a dispute of material fact.  Kean testified that when he was hired, no plan for a reorganization existed and that he was given the power to create a plan.  Thus no one knew what it would ultimately look like.  *Id.* at pp. 21:17-22:7.  Whether or to what extent employees recognized that their jobs were in danger is not material to whether Kean acted pursuant to an unlawful bias based on age or disability when selecting Plaintiff for elimination.  Even if Plaintiff's assertion that Kean told them their jobs were safe were true, there is also no evidence that Plaintiff was told any different information than that shared with the other employees. Whether Plaintiff was given job descriptions of the new positions, or cross-training, or provided in advance with the criteria used to assess the skills of the technical staff is also not material. Plaintiff failed to submit any evidence that anyone outside of the

protected categories was treated any differently than he based on age or disability.  While he conclusorily claims without any citation to the record that no other employee in the technical team was disabled, there is no evidence in the record as to the physical or mental impairments of any other employee at Panduit to establish a comparison.

Furthermore, a plaintiff cannot raise a genuine issue of material fact merely by contradicting his own earlier sworn statement.  *Holtzclaw v. DSC Comm. Corp.*, 255 F.3d 254, 259 (5th Cir. 2001); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)(holding that an affidavit impeaching earlier sworn deposition testimony, without explanation, cannot create a fact issue).

Plaintiff makes a number of statements without citations to the record that are not supported by testimony or evidence, including the following:  (1) the Panduit job posting to which he originally responded sought someone with software experience with data centers; (2) Plaintiff was hired to assist the sales force in selling a particular software product (PIM); (3) he had the same software focus at the time he was terminated; (4) his SSE job was different from that of the AEs and RTSMs, both of which required different skill sets from that of an SSE; (5) he lacked personal knowledge of the skills or duties possessed by AEs and RTSMs; and (6) the RTSM positions required expertise in cabling issues to discuss the technical aspects of copper or fiber.  #17, Ex. A at

pp. 30:16-31:7; 34:13-22; 36:17-21; 42:4-43:8; 57:15-24; 58:25-59:14; 60:24-63:9.

Furthermore, Plaintiff has conceded that (1) he lacks personal knowledge to support his claim that his SSE position was not eliminated (#17, Ex. A, 76:2-77:1; 86:4-12); (2) he lacked personal knowledge about who was involved in the decision to terminate him (*id.*, 80:22-81:10); (3) he lacked personal knowledge about the process used to select employees for layoff (*id.*, 81:11-14); (4) he lacked personal knowledge beyond hearsay conversations about whether any employees were demoted (*id.*, 82:10-13, 84:4-12); (5) when asked to identify any younger employees who were retained but who had inferior skills to his own, Plaintiff identified only Mike Mazzotta (46), Kevin Hogan (42), and Jorge Labrada (48)(Ex. A, 88:2-23). There is no evidence in the record about the substantive qualifications of these three men by themselves or in comparison to those of Plaintiff.

Subsequently Plaintiff identified Steve Turvey and Jason Campbell as younger, less qualified employees performing the same or similar job as he but who were kept on in the reorganization. #17 at p.11. Panduit points out that Campbell was employed as an AE, a position which Plaintiff has stated was different from his own and required a different skill set. Turvey had the only position in Canada. Plaintiff makes no showing that his skills were superior to those of Turvey or Campbell. #16, Ex. F; #17, Ex. A, p. 42:4-19. Panduit further emphasizes that Plaintiff

"selectively ignores" the other ten or eleven employees considered in the reorganization, the average age of whom was over 50.

Plaintiff requested an accommodation of a car allowance[22] in lieu of the Taurus car benefit for his disability on November 18, 2010. #17, Ex. H. He now tries to imply he made that request merely a few months before his discharge and claims that Fideli, who had the car discussion with Plaintiff, was involved in the decision to terminate him. Despite this effort, Plaintiff has conceded, and the emails confirm, that discussions regarding a company car occurred in October and November 2010 before Kean was hired and almost a year before the September 2011 layoffs. #17, Ex. A at pp. 132:22-133:2; Ex. H. As indicated earlier, Plaintiff testified that he did not know who was involved in the decision to lay him off. During his deposition Kean testified that human resources was not involved in the decision, but only in communication of that decision, and Plaintiff has not submitted any controverting evidence. Kean Dep., #16, Ex. D at pp. 54:15-55:16.

Although in his affidavit (#17, Bleiweiss Affid., Ex. C., made on April 10, 2014, months after his deposition on December 17, 2013 and in conflict with it without the required

---

[22] The Court observes that during his deposition, Plaintiff conceded that once the new Taurus was returned to Pandit, he took Panduit up on its offer to reimburse him for mileage on his personal vehicle, which was the Trail Blazer SUV he had been allotted previously and which he purchased when Pandit switched to Ford Taurus sedans as its company cars. #17, Ex. a at p. 107:5-11.

explanation for such disparities), Plaintiff states that he never
met with Kean, yet he previously testified during his deposition
that they spent two days together on a sales trip in Iowa and
Nebraska, during which Kean could observe Plaintiff making sales
calls.  During his deposition he also testified that between April
and September 2011 he took approximately 10-12 trips to the
corporate offices and personally saw Kean on those occasions.
#17, Ex. A at 121:25-122:23.  He also joined in "a few" phone
conferences with Kean.  *Id.* at pp. 42:20-43:8.  Regardless, argues
Panduit, even if Plaintiff's contradictory statements were
accurate, his declaration, filled with hearsay assertions, does
not and cannot defeat the assessment made by Kean on interactions
he had with all the members of the team and his personal
assessment of Plaintiff's skills.

Furthermore, Plaintiff cannot satisfy his burden to
present *prima facie* cases for age and disability discrimination
simply by asserting his subjective opinion of his skills or
qualifications.  *Adeleke v. Dallas Area Rapid Transit*, 487 Fed.
Appx. 901, 903 (5th Cir. Aug. 27, 2012)("Adeleke's subjective
opinions regarding his relative qualifications for the positions
are insufficient to establish that he clearly was better qualified
and that DART's reason for not hiring him is a pretext for
discrimination."), *cert. denied*, 134 S. Ct. 137 (2012); *Jamerson
v. Bd. of Trustees*, 662 F.2d 320, 324 (5th Cir. 1981).  Plaintiff
fails to show that retained younger employees were clearly less
qualified than he, and there is no evidence in the record of any

physical or mental impairments of any other Panduit employee to demonstrate that others outside the protected group were treated more favorably than he.

Indeed the absence of comparative evidence to show that Plaintiff was treated less favorably than those outside of both his protected categories is fatal to his *prima facie* cases and to his claims.  Plaintiff's evidence of age discrimination is limited to his subjective view of his skills and the fact that two individuals out of ten retained employees were under 40 years of age.  He ignores the fact that another 58-year-old employee  and one  of  three  employees over fifty were retained in the reorganization.  Plaintiff failed to make a record showing whether any of his co-employees were within or outside of a group with a disability.  His disability claim is simply based on an inference that because his request for a car allowance in October 2010 was denied before Kean was hired, Kean's decision to lay Plaintiff off in the reorganization was based on his disability.  That inference is insufficient to meet his burden on a  *prima facie* case of disability discrimination.  Even if Plaintiff had established *prima facie* cases of age and disability discrimination, he fails to  show  that the reasons given by Kean were a pretext for discrimination.

### Court's Decision

After a careful review of the briefs, the evidence in the record, and the applicable law, the Court concurs with Panduit for the reasons it states, demonstrating that Plaintiff has failed

to meet his burden of proof on summary judgment, that Panduit's motion should be granted.

Plaintiff fails to make a *prima facie* case of age or disability discrimination in his layoff in the course of a reorganization of Panduit's business.  Regarding both his age his disability discrimination claims, Plaintiff fails to show that he was qualified to assume one of the new positions (TSE or support engineer) after the SSE positions were eliminated, or, in the case of disability discrimination, that a reasonable accommodation would allow him to be.[23]  He offers only subjective and conclusory claims, but not evidence, that he was qualified by education, experience and skills for the new positions of TSE and/or support engineer created by the reorganization.  Although Plaintiff conclusorily asserts that the SSE positions were not eliminated and that Panduit merely changed the title and advertised for applicants, Plaintiff fails to provide any evidence in support of that contention, or, concomitantly, to show that he was replaced by an identified, younger or nondisabled person who was performing the same duties, and not more, than what Plaintiff had performed as an SSE.  Nor has he shown that he was more qualified than those

---

[23] The Court notes that neither Plaintiff nor Kean has contended that the issue of an SUV versus a sedan is relevant to Plaintiff's inability to qualify as a TSE or support engineer, not to mention that Plaintiff accepted Panduit's offer of repayment of his business travel expenses after Plaintiff's purchase of the SUV that had previously been allotted to him to use as a company vehicle.  An employee does not have the right to dictate his preferred accommodation to an employer. *Griffin*, 661 F.3d at 224.

former SSEs and AE employees who were retained as TSEs or support engineers.

In contrast Panduit has presented uncontroverted evidence demonstrating Kean's reorganization plan, the need for wider expertise in the newly created positions than the skill set Plaintiff brought to his SSE job in the earlier regional structure, and the criteria (including the survey that Plaintiff chose not to complete) that Kean employed in deciding who of the SSEs and AEs could meet the job requirements of a TSE and/or support engineer.[24]

Even if Plaintiff had made the requisite *prima facie* cases of age and disability discrimination, Panduit has articulated a legitimate, nondiscriminatory reason for laying off Plaintiff, i.e., that the RIF eliminated his and all SSE positions and that Plaintiff was not qualified for the newly created positions of TSE or support engineer. Plaintiff has not shown that these reasons were unworthy of credence or a pretext for discrimination. If an individual cannot perform the essential requirements of the job, the law does not require an employer to reassign the employee to an occupied job, or to create a new job for him, or to eliminate essential functions of the job, or to assign existing employees or hire new employees to perform the

---

[24] As noted earlier, despite Plaintiff's claim that Kean never met with him or had an opportunity to evaluate his professional skills, Plaintiff's own deposition testimony about his disability being apparent on the business trip in Iowa and Nebraska taken by Kean and himself undermines the veracity of his assertion.

functions of the employee's job that the employee could not perform.  *Wilkerson*, 2014 WL 5282242 at *7, *citing inter alia Toronka v. Continental Airlines, Inc.*, 411 Fed. Appx. 719, 724 (5th Cir. 2011).

Finally, the Court concurs with Panduit that the lack in the record of evidence of comparators to show that Plaintiff was treated less favorably than those outside the protected classes is fatal to his claims.

Accordingly, for the reasons stated in this Opinion and Order, the Court

ORDERS that Panduit's motion for summary judgment is GRANTED.  A final judgment will issue by separate order.

**SIGNED** at Houston, Texas, this  13th  day of   January  , 2015.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

- 49 -